[This opinion has been published in *Ohio Official Reports* at 80 Ohio St.3d 371.]

THE STATE OF OHIO *v.* BERRY.

[Cite as *State v. Berry*, 1997-Ohio-336.]

*Criminal law—Aggravated murder—Death penalty—Defendant waives further challenges to his death sentence—Standard by which competency is to be evaluated—Execution warrant issued by Supreme Court.*

(No. 93-2592—Submitted September 24, 1997—Decided December 3, 1997.)

ON MOTION to Adopt Findings of Fact and Opinion and to Issue Execution Warrant.

_____

{¶ 1} Wilford Lee Berry, Jr., was convicted of the aggravated murder of Charles Mitroff and sentenced to death. His conviction and death sentence were affirmed by the court of appeals and, in June 1995, by this court. *State v. Berry* (1995), 72 Ohio St.3d 354, 650 N.E.2d 433. Berry desires to submit to execution of his death sentence, and therefore to terminate further challenges to his conviction and sentence. The Ohio Public Defender, who has been representing Berry, claims that he is not mentally competent to make such a decision. The state contends that Berry is competent.

{¶ 2} After repeated representations by Berry to this court and others that he desired to discontinue this litigation, the state filed a motion in this court for a competency hearing. We ordered an evaluation of Berry's competence and appointed Dr. Phillip J. Resnick to conduct the evaluation. See *State v. Berry* (1995), 74 Ohio St.3d 1460, 656 N.E.2d 1296; 74 Ohio St.3d 1470, 657 N.E.2d 511; (1996), 74 Ohio St.3d 1492, 658 N.E.2d 1062. Dr. Resnick examined Berry in April 1996.

{¶ 3} We articulated the standard by which Berry's competence is to be evaluated as follows: "A capital defendant is mentally competent to abandon any

and all challenges to his death sentence * * * if he has the mental capacity to understand the choice between life and death and to make a knowing and intelligent decision not to pursue further remedies. The defendant must fully comprehend the ramifications of his decision, and must possess the 'ability to reason logically,' *i.e.*, to choose 'means which relate logically to his ends.' " (Citations omitted.) *State v. Berry* (1996), 74 Ohio St.3d 1504, 659 N.E.2d 796.

{¶ 4} Subsequently, we remanded the cause to the Court of Common Pleas of Cuyahoga County with directions to hold a hearing on the issue of Berry's competence, render findings of fact, and return the case to this court for further proceedings. *State v. Berry* (1996), 77 Ohio St.3d 1439, 671 N.E.2d 1279.

{¶ 5} The state called two witnesses: Dr. Resnick and Dr. Robert W. Alcorn, a psychiatrist agreed upon by the state and the Public Defender and appointed by the common pleas court, who examined Berry in 1997. Drs. Resnick and Alcorn found Berry to be competent. The Public Defender also called two witnesses: Dr. Sharon L. Pearson, a psychologist who examined Berry in 1995 at the Public Defender's request and found him incompetent, and Dr. Jeffrey L. Smalldon, a psychologist who never examined Berry and had no opinion as to his competence, but who testified generally regarding schizotypal personality disorder and its relevance to determining a person's competence. (The Public Defender also proffered the testimony of attorney Alan Freedman, a specialist in appeals of capital cases, who gave an opinion of Berry's chances of prevailing on federal habeas corpus; however, that testimony was not admitted.)

{¶ 6} After hearing the evidence, the trial judge found that Berry "is competent to forgo any and all further legal challenges." She found that Berry understands the choice between life and death, has the capacity to make a knowing and intelligent decision not to pursue further remedies and the capacity to reason logically, and fully comprehends the ramifications of his decision.

2

**{¶ 7}** She further found that Berry suffers from a mixed personality disorder with schizotypal, borderline, and antisocial features, and that he has no mental disease. Berry's disorder does not prevent him from understanding his legal position and the options available to him, or from making a rational choice between those options. He understands that abandoning his appeals will result in his being put to death, and he considers death preferable to life in prison.

**{¶ 8}** The judge found that the view of Resnick and Alcorn that Berry was competent is "more credible and convincing" than Pearson's view that he was not. The judge noted that Resnick is highly experienced and "nationally recognized for his work." The judge regarded Pearson as "sincere" and her conclusions as "thoughtful," but noted her "minimal experience in the area of forensic psychiatry." She also found it curious that Berry's rigidity of thought, which Pearson had testified was the primary factor in her conclusions, was not mentioned in her written report. The judge also based her conclusions on her own "opportunity to carefully observe the demeanor of Mr. Berry."[1]

**{¶ 9}** Finally, after an extensive colloquy with Berry, the judge found that Berry has in fact voluntarily, knowingly, and intelligently decided to forgo any future challenges to his conviction and death sentence, and that he is aware of his constitutional right to counsel and the dangers and disadvantages of self-representation.

**{¶ 10}** The hearing record was filed in this court on July 25, 1997. The cause is now before us pursuant to our order of November 18, 1996, reported at 77 Ohio St.3d 1439, 671 N.E.2d 1279, *supra*, and upon the state's motion for the issuance of an execution warrant.

---

1. We note that Berry engaged in some disruptive conduct during status conferences that preceded the evidentiary hearing, but not during the hearing itself.

*Betty D. Montgomery*, Attorney General, *Jeffrey S. Sutton*, State Solicitor, *Simon B. Karas*, Deputy Chief Counsel, *Sharon McClellan* and *Karl Wetzel*, Assistant Attorneys General; *Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, and *George J. Sadd*, Assistant Prosecuting Attorney, urging allowance of the motion.

*David H. Bodiker*, Ohio Public Defender, *Joseph E. Wilhelm*, Appellate Supervisor, Death Penalty Division, and *J. Joseph Bodine, Jr.*, Assistant Public Defender, urging denial of the motion.

———————————

**Per Curiam.**

**{¶ 11}** We have reviewed the record and considered the arguments of the state and the Public Defender. Based on our review, we find that Berry is competent to forgo all further reviews of his conviction and sentence.

## I. Jurisdiction

**{¶ 12}** The Public Defender argues that the Ohio Constitution gives us no jurisdiction to determine Berry's competence. Section 2(B)(1)(f), Article IV, Ohio Constitution, grants this court original jurisdiction "[i]n any cause on review as may be necessary to its complete determination." However, the Public Defender argues that, because this court has decided Berry's direct appeal, Berry's case is not presently a "cause on review" before this court.

**{¶ 13}** *State v. Steffen* (1994), 70 Ohio St.3d 399, 639 N.E.2d 67, demonstrates that the term "cause on review" is not limited to cases currently pending on direct appeal. In *Steffen*, we issued an order prohibiting other Ohio courts from granting further stays of execution to ten condemned prisoners. Each of the ten had completed his direct appeal to this court and at least one motion for delayed reconsideration and/or reinstatement of his appeal. Nine had also completed one round of postconviction relief under R.C. 2953.21. Not one had any litigation then pending before this court. See 70 Ohio St.3d at 399-405, 639 N.E.2d

4

at 69-72. In *Steffen*, we specifically cited Section 2(B)(1)(f) to support our exercise of jurisdiction, even though the capital cases were not then before us on appeal. *Id.* at 407-408, 639 N.E.2d at 74.

{¶ 14} Similarly, we have regularly set execution dates and granted stays of execution well after issuing our mandate in capital appeals.[2] Were the Public Defender correct, we could do neither.

## II. The Test of Competence: *Rees v. Peyton*

{¶ 15} In *Rees v. Peyton* (1966), 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583, one Rees (a condemned prisoner) filed a petition for certiorari in the United States Supreme Court seeking review of a federal court judgment denying habeas corpus relief. Subsequently, Rees directed his counsel to withdraw the petition and forgo any further attacks on his conviction and sentence. Counsel had Rees examined by a psychiatrist, who concluded that Rees was incompetent.

{¶ 16} The Supreme Court, while retaining jurisdiction over the cause, directed the federal district court to determine Rees's mental competence, framing the question as follows: "[W]hether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." 384 U.S. at 314, 86 S.Ct. at 1506, 16 L.Ed.2d at 584-585.

{¶ 17} The Public Defender contends that under *Rees*, if there exists even a possibility that Berry's mental disorder has affected his decisionmaking capacity in any way and to any degree, this court must find him incompetent. See *Rumbaugh*

---

2. See, *e.g.*, *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643, reconsideration denied (1995), 74 Ohio St.3d 1485, 657 N.E.2d 1378, stay granted (1996), 74 Ohio St.3d 1503, 659 N.E.2d 795; *State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524, reconsideration denied (1995), 71 Ohio St.3d 1459, 644 N.E.2d 1031, stay granted (1995), 71 Ohio St.3d 1488, 646 N.E.2d 464, stay terminated (1996), 74 Ohio St.3d 1502, 659 N.E.2d 794, stay granted (1996), 74 Ohio St.3d 1515, 660 N.E.2d 470.

*v. Procunier* (C.A.5, 1985), 753 F.2d 395, 405 (Goldberg, J., dissenting). We disagree.

**{¶ 18}** If a mere possibility were enough to render a defendant incompetent, there would have been no need in *Rees* for a competency determination by the federal district court. Rees had been "examined by a psychiatrist who filed a detailed report concluding that Rees was mentally incompetent." 384 U.S. at 313, 86 S.Ct. at 1506, 16 L.Ed.2d at 584. Thus, *before* the decision in *Rees*, there was already a strong possibility that Rees's decision was substantially affected by his mental condition.

**{¶ 19}** In *Smith v. Armontrout* (C.A.8, 1987), 812 F.2d 1050, the court expressly considered this issue.[3] The "next-friend petitioners" in that case, like the Public Defender here, focused on the word "may" in the second half of the *Rees* test. "*Rees*, they maintain, indicates through its use of the word 'may' that an inmate must be found incompetent where the evidence establishes even a mere *possibility* that a mental disorder substantially affected the decision." (Emphasis *sic*.) *Id*. at 1057.

**{¶ 20}** The *Smith* court rejected that analysis:

"[T]he petitioner's literal interpretation of the half of the *Rees* test which asks whether the prisoner suffers from 'a mental disease, disorder, or defect which may substantially affect his capacity,' would conflict with a similarly literal interpretation of the other half of the test, which asks whether the prisoner has, rather than absolutely, certainly, or undoubtedly has, the capacity to appreciate his position and make a rational choice. Though *Rees* recites these two portions of the standard as disjunctive alternatives, there is necessarily an area of overlap between

---

3. The Public Defender cites *In re Heidnik* (C.A.3, 1997), 112 F.3d 105, in support of his position, but *Heidnik* simply recites the *Rees* standard, without expressly considering whether a defendant must be deemed incompetent upon a mere *possibility* that a mental disorder substantially affects his capacity.

the category of cases in which at the threshold we see a possibility that a decision is substantially affected by a mental disorder, disease, or defect, and that of cases in which, after proceeding further, we conclude that the decision is in fact the product of a rational thought process.

"Furthermore, we think it very probable * * * that in every case where a death-row inmate elects to abandon further legal proceedings, there will be a possibility that the decision is the product of a mental disease, disorder, or defect. Yet, *Rees* clearly contemplates that competent waivers are possible * * * and there is little point in conducting a competency inquiry if a finding of incompetency is virtually a foregone conclusion." 812 F.2d at 1057.

{¶ 21} We agree with the *Smith* court's analysis and therefore reject the notion that the bare possibility of a mental disorder's substantially affecting the condemned's decisionmaking capacity is enough to require a finding of incompetence. Ultimately, the question is not whether a defendant "may" lack the capacity to make a rational choice, but whether he in fact has that capacity.

{¶ 22} As for the standard we enunciated earlier in this case, it is wholly consistent with *Rees*, and in fact reflects a more specific definition of the general terms used in *Rees*. Thus, in our view, a defendant "has capacity to appreciate his position," *Rees*, *supra*, if he understands the choice between life and death, see *Franz v. State* (1988), 296 Ark. 181, 189, 754 S.W.2d 839, 843; *State v. Dodd* (1992), 120 Wash.2d 1, 23, 838 P.2d 86, 97, and he fully comprehends the ramifications of his decision to waive further legal proceedings, see *Cole v. State* (1985), 101 Nev. 585, 588, 707 P.2d 545, 547. And a defendant has the capacity to "make a rational choice with respect to continuing or abandoning further litigation," *Rees*, *supra*, if he can make a voluntary, knowing, and intelligent decision, *Franz*, *supra*, at 189-190, 754 S.W.2d at 844; *Dodd*, *supra*, at 23, 838 P.2d at 97; and he has the "ability to reason logically," *i.e.*, to choose "means which

relate logically to his ends," see *State v. Bailey* (Del.Super.1986), 519 A.2d 132, 137-138.

{¶ 23} In *Whitmore v. Arkansas* (1990), 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135, when a condemned prisoner refused to pursue an appeal to the state supreme court, the issue was whether a "next friend" could seek a writ of certiorari on his behalf from the United States Supreme Court. *Whitmore* held that the would-be "next friend" could not establish standing unless he could at least show that the prisoner "is unable to litigate his own cause due to mental incapacity * * * or other similar disability." *Id.* at 165, 110 S.Ct. at 1728, 109 L.Ed.2d at 151. *Whitmore* further held that a "next friend" may not proceed on a prisoner's behalf "where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded." *Id.*

{¶ 24} In *Whitmore*, the Arkansas trial court had held an evidentiary hearing and found the defendant to have the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence. See *Simmons v. State* (1989), 298 Ark. 193, 194, 766 S.W.2d 422, 423. That being so, the would-be "next friend" could not make the required showing of incapacity, and thus could not establish standing to litigate the prisoner's case against his will.

{¶ 25} It appears, then, that the standard used to determine competence in Arkansas—capacity to understand the choice and to make a knowing and intelligent waiver—has been accepted by the United States Supreme Court. See *Dodd*, 120 Wash.2d at 22-23, 838 P.2d at 97, citing *Whitmore*, 495 U.S. at 165, 110 S.Ct. at 1728, 109 L.Ed.2d at 151-152; *Grasso v. State* (Okla.Crim.App.1993), 857 P.2d

802, 806. Cf. *Gilmore v. Utah* (1976), 429 U.S. 1012, 1013, 97 S.Ct. 436, 437, 50 L.Ed.2d 632, 633.[4]

### III. Berry's Mental Evaluations

**{¶ 26}** Dr. Sharon L. Pearson conducted the most extensive interviews. She saw Berry three times during July and August 1995, not long after this court affirmed his convictions and sentence. Dr. Pearson spent 4.5 hours administering psychological tests, including the Minnesota Multiphasic Personality Inventory. She also interviewed Berry for a total of 7.5 additional hours. Finally, Dr. Pearson reviewed an impressive amount of background material on Berry's mental health history.

**{¶ 27}** Dr. Pearson found in Berry symptoms of a "schizotypal personality disorder," a "rigid thought process," a tendency toward "extreme isolation and withdrawal," and a tendency to have psychotic episodes under stress. She concluded that Berry was not competent to waive his rights. Her conclusion was reached with reference to what she called a "clinical" definition of "competence," not a legal one.[5]

**{¶ 28}** Dr. Philip J. Resnick interviewed Berry for 2.75 hours and reviewed extensive materials on his mental health history, as well as Dr. Pearson's report.

**{¶ 29}** Dr. Robert W. Alcorn interviewed Berry for 1.5 hours. He did not review any materials on Berry's mental health history, but he did discuss Berry's history with Berry himself, and he also reviewed the reports of Drs. Pearson and

---

4. The Public Defender questions the value of *Whitmore* and *Gilmore,* asserting that those cases turned on the issue of a next friend's standing to press a condemned prisoner's claims in federal court. But the standing issue itself turns on the question of competence, and the Public Defender does not explain why the constitutional standard of competence used in state court should differ from that used in federal court.

5. The Public Defender's assertion that "Dr. Pearson * * * evaluated Berry under the *Rees v. Peyton* standard" is incorrect.

Resnick; those reports related Berry's history to such an extent that Alcorn did not find it necessary to review the materials.

{¶ 30} Drs. Resnick and Alcorn diagnosed a mixed personality disorder with schizotypal, borderline, and antisocial features. Dr. Alcorn explained that a "mixed personality disorder" means that a patient exhibits features of more than one type of disorder, but is "not clearly in one category or another." Both psychiatrists concluded that Berry was competent to decide against pursuing further remedies, measured by the legal standard established by this court.

{¶ 31} None of the three experts found Berry to be psychotic.[6] Dr. Resnick testified that "psychosis is a major mental disorder in which a person is out of touch with reality * * *."

{¶ 32} While imprisoned in Texas in the 1980s, Berry reported hallucinations, was diagnosed with schizophrenia, and was placed on antipsychotic medication. However, when he stopped taking the medicine, his hallucinations did not recur, leading Dr. Resnick to question the accuracy of the Texas diagnosis. In 1990, Dr. Robert W. Goldberg diagnosed Berry with "psychotic disorder not otherwise specified." The 1990 diagnosis was made in connection with Berry's then-upcoming aggravated murder trial, in which Dr. Goldberg was a defense witness. Dr. Resnick testified that Berry may have been malingering in 1990, but Resnick could give no opinion on that point. Drs. Alcorn and Pearson testified that Berry may have brief psychotic reactions under stress. However, Dr. Resnick pointed out that the consistency of Berry's desire to drop his appeals and be executed indicates that this desire is not the result of any transitory mental state.

---

6. The Public Defender asserts that Drs. Resnick and Alcorn based their findings of competence wholly upon the absence of an active psychosis. They did not, however; indeed, Dr. Resnick testified that the absence of psychosis "isn't the only issue in determining whether or not he is competent."

**{¶ 33}** Berry believed that when he died, he would be judged by God and go to heaven or hell. The psychiatric profession does not regard this sort of commonly held religious belief as a sign of mental illness, according to Dr. Alcorn. Berry had no unusual or delusional beliefs about the afterlife. He has considered donating his organs. Both Dr. Resnick and Dr. Alcorn concluded that he understood the difference between life and death and the permanence of death. (Dr. Pearson was not asked her opinion on this point.)

**{¶ 34}** Berry told all three doctors that he would prefer freedom to death if he thought it a reasonable possibility. Dr. Pearson did not believe that he was being deceptive about that, even though she also believed Berry had a compulsive desire to be dead. Given the evidence, it seems clear that Berry understands the difference between life and death.

**{¶ 35}** The Public Defender's chief contention at the evidentiary hearing was that, due to his mental disorder, Berry does not *fully* comprehend the ramifications of his decision. Although he clearly understands that abandoning his legal remedies will lead to his death, he does not understand that pursuing them may mean freedom, which he says he prefers to death. This lack of understanding, according to Dr. Pearson, results from the rigid thinking caused by his mental disorder. Having formed the fixed notion that he has little chance of freedom, he refuses to listen to his attorneys when they try to tell him otherwise.

**{¶ 36}** Berry's "rigid thought process" was crucial to Dr. Pearson's conclusion that Berry was incompetent. According to Dr. Pearson, rigid thinking is a result, and a symptom, of Berry's schizotypal disorder. Pearson believed that Berry's rigidity rendered him psychologically unable to absorb information from his attorneys if it conflicted with his preconceptions as to his chance of succeeding in further litigation.

**{¶ 37}** Pearson testified that Randy Ashburn of the Public Defender's Office, one of Berry's attorneys, told her Berry had a fairly good chance of success.

She testified that she relayed that information to Berry, and she found him "very closed to that [idea] and very committed to the way he thought, which was he did not have any chance of prevailing." Berry's attorneys told Pearson that they had tried to convey the same information to Berry.

{¶ 38} Dr. Pearson believed that Berry was "unable to take in" that information. However, her conclusion is undermined by her concession that Berry understands that the public defenders think his litigation can be successful. Furthermore, Dr. Pearson conceded that it is "possible" that the rejection of his appeals by this court and the court of appeals may have contributed to Berry's attitude, and when asked, "Isn't he taking in information?" she replied, "Yes."

{¶ 39} Moreover, Berry's unwillingness to receive this information from Dr. Pearson does not necessarily support her belief that he was unable to absorb information that conflicted with his preconceptions. There was no evidence that Dr. Pearson was giving Berry any new information; she was merely passing along the opinion of Berry's attorneys, of which Berry was already aware and which he had already rejected.

{¶ 40} Moreover, Berry has *not* rejected the possibility of having his conviction overturned. Berry told Dr. Resnick that he knows he is guilty of the Mitroff murder, and that "*even if he had a second trial, he would be found guilty again*, sentenced to death again and ultimately executed." (Emphasis added.) He told Dr. Alcorn that "the confession of Lozar [Berry's co-defendant] would lead to his own conviction and inevitable execution for the crime."

{¶ 41} Thus, Berry does not want his conviction overturned, as he believes that will lead to a result he finds undesirable, as he told Dr. Resnick, "to wait around on death row for 20 years" only to be executed anyway. Drs. Resnick and Alcorn stated that this was a rational choice. According to Dr. Resnick, it is common for condemned inmates to at least "weigh whether they would prefer to be executed" because of the "misery" associated with life in prison.

{¶ 42} Pearson said that people with schizotypal disorder "latch onto one issue" which becomes "the focus of the obsessive thinking and the compulsive behavior." Yet she then said that Berry's desire to waive further review of his case was his "most significant issue"—implying that there might be others.

{¶ 43} When asked on what other issues Berry had shown rigidity, Dr. Pearson said, "I have no way of knowing." Despite that, she offered other examples of Berry's rigidity.

{¶ 44} Many of her examples were unpersuasive. For instance, Dr. Pearson testified that "there was some report of him writing threatening notes to a woman. * * * It may represent a rigid perception that was inaccurate that he would be acting on." However, Dr. Pearson conceded on cross-examination that she did not know whether Berry had rejected any information or advice from anyone with regard to that situation so that his perception could fairly be called "rigid."

{¶ 45} According to Dr. Pearson, Berry was "adamant" in his belief that a lung condition he had suffered from would come back and kill him, even though it had been surgically corrected. Berry told Dr. Pearson that his surgeon had told him that "he was a corpse looking for a place to die." Dr. Pearson testified that she consulted "medical people" and medical literature and found that "once corrected [the condition] was pretty much corrected." She told Berry this at a later interview, but he "did not * * * take it in."

{¶ 46} However, Dr. Pearson is not a medical doctor. Berry's refusal to consider her opinion on a medical subject, as against the opinion of his surgeon,[7] does not seem to be persuasive evidence of a disabling degree of rigidity. In any case, he told Drs. Resnick and Alcorn he was not worried about his lung; while he

---

7. Dr. Pearson seemed to doubt Berry's account of what his surgeon had told him, but there was no evidence one way or the other.

did believe his lung condition might kill him, he seemed more worried about living a long time on death row.

**{¶ 47}** Dr. Pearson said Berry was rigid in his belief that "people can't be trusted"; yet she conceded that he did trust Cynthia Yost, one of his attorneys.

**{¶ 48}** Dr. Pearson said Berry is rigid in his lifelong, compulsive desire to be dead. But Berry told Dr. Pearson he would rather be free than dead, and Dr. Pearson conceded that Berry was not lying or being deceptive about this. Moreover, although Berry has a history of suicide attempts, it has been nine years since Berry's last such attempt, and he told Dr. Resnick he thought suicide was "stupid." And Dr. Pearson agreed with Drs. Resnick and Alcorn that Berry does not suffer from clinical depression, although he has so suffered in the past. (Dr. Resnick noted that the consistency of Berry's desire for execution indicates that his desire is not attributable to changes in his mood.)

**{¶ 49}** "Defensiveness" or "minimization" occurs when a patient tries to conceal symptoms and appear healthier than he is. All three experts detected defensiveness on Berry's part. For instance, in the Alcorn and Pearson interviews, Berry initially denied ever having had hallucinations. However, he ultimately admitted to all three doctors that he *had* suffered hallucinations in the past.

**{¶ 50}** Dr. Pearson testified that, particularly when defensiveness is suspected, it is important to spend enough time with the patient to "wear the person down," because "[a]nybody can keep themselves [*sic*] together for a couple of hours." However, according to Dr. Resnick, prolonging the interview is not helpful in detecting defensiveness. In fact, as noted, all three experts were able to detect Berry's defensiveness and evaluate his mental condition.

**{¶ 51}** Dr. Pearson administered an IQ test. Berry's IQ was one hundred, placing him "in the average level of intellectual functioning," according to Dr. Pearson's report. Dr. Pearson testified that "Wilford is very bright and Wilford has

a lot of intellectual ability." She also conceded that Berry was engaging in logical thought processes.

{¶ 52} Dr. Resnick described Berry as "articulate"; "his speech showed clear, logical thinking and no confusion or disorganization of thoughts." He showed "adequate concentration, attention and memory" and exhibited "fair" judgment. He further demonstrated reasoning ability by explaining to Dr. Resnick why he preferred electrocution to lethal injection and giving a specific, rational reason for his preference. Dr. Alcorn noted that Berry did well on tests measuring concentration. None of the three experts found any evidence of organic brain damage.

{¶ 53} All three experts were in agreement on many issues: that Berry has a disorder, but not a psychosis; that he is defensive; that he would prefer freedom to death; that he is logical and moderately intelligent. To the extent that they differed, we find the conclusions of Dr. Resnick and Dr. Alcorn more credible than those of Dr. Pearson.

{¶ 54} Dr. Resnick, the Director of the Cuyahoga County Court Psychiatric Clinic since 1976, is an eminent authority in the field of forensic psychiatry. He is a professor of psychiatry at the Case Western Reserve University School of Medicine. He is also a lecturer in law and psychiatry at the Case Western Reserve University Law School and has held "distinguished visiting professorships" at four other institutions. He serves as Director of the Fellowship in Forensic Psychiatry and Director of the Division of Forensic Psychiatry at the University Hospitals of Cleveland.

{¶ 55} Dr. Resnick is a past president of the American Academy of Psychiatry and the Law, chairman of the Ohio Psychiatric Association Forensic Committee, vice-president of the Cleveland Psychiatric Society, a fellow of the American Psychiatric Association, and a member of the Council on Accreditation

for Fellowships in Forensic Psychiatry. He is certified by the American Board of Psychiatry.

{¶ 56} Dr. Resnick has given numerous lectures on such subjects as the detection of malingering, the insanity defense, and the psychiatric prediction of violence. His *curriculum vitae* reflects fourteen major international presentations and ninety-five major American presentations. He has written or co-authored one book, twenty-five book chapters and contributions, and fifty articles in professional journals. He has testified before the Judiciary Committees of the Ohio House of Representatives and Senate and the National Commission on the Insanity Defense. Finally, he has testified numerous times in criminal cases, in Ohio and other jurisdictions.

{¶ 57} Dr. Alcorn is also highly experienced in forensic psychiatry. After completing his residency in 1974, Dr. Alcorn worked for the Cuyahoga County Court Psychiatric Clinic between 1979 and 1995. He is Medical Director of Mental Health Services, Inc., and assistant clinical professor in the psychiatry department of the Case Western Reserve School of Medicine. He has received specialized education in criminal law and "psychiatry and the law," and he is certified by both the American Board of Psychiatry and Neurology and the American Board of Forensic Psychiatry. His *curriculum vitae* indicates extensive teaching experience and lists eight scientific presentations on subjects including malingering in criminal cases, the insanity defense, and depression. He has testified numerous times on competency and sanity issues.

{¶ 58} While Dr. Pearson is certainly qualified, her experience in forensic matters is limited. Dr. Pearson has been a self-employed clinical psychologist since 1988. About twenty-five percent of her practice consists of forensic examination, and she has testified in approximately twenty cases, about a third of which were criminal. Dr. Pearson is also a clinical assistant professor at the Wright State University School of Professional Psychology. Her *curriculum vitae* lists several

workshops and presentations, although none seems to have specifically dealt with forensic psychology.

**{¶ 59}** In our view, Dr. Pearson's crucial testimony on the subject of "rigidity" was unpersuasive. Moreover, we note Dr. Pearson's failure to make any reference to Berry's rigidity of thought in her written report, given her testimony that Berry's rigidity was "the primary factor in my decision that he was not able to waive his rights * * *."

**{¶ 60}** We note that Dr. Pearson was brought into the case by the Public Defender; the other two experts were court-appointed. Dr. Pearson did not apply any legal standard of competence. Instead, she used the following "clinical" definition of "competence": "If someone has the capacity, ability to do something. If someone is competent that means they are functional, they are capable, able." This definition is logically circular, and therefore analytically useless.

**{¶ 61}** Dr. Pearson did spend over twice as much time with Berry as Drs. Resnick and Alcorn combined. But Dr. Resnick testified that one need not spend a great deal of time with a patient to detect defensiveness — and both he and Dr. Alcorn *did* detect it in Berry and take it into account. Moreover, Drs. Resnick and Alcorn had the benefit of reading Dr. Pearson's report before making their own evaluations. It is difficult to conclude that Drs. Resnick and Alcorn failed to spend an adequate amount of time with Berry, especially since their conclusions were, in many pertinent respects, the same as Dr. Pearson's.

### IV. Application of the *Rees* Standard

**{¶ 62}** We find that Berry possesses the mental capacity to appreciate his position and to make a rational choice with respect to continuing or abandoning further litigation. While Berry does have a mental disorder, it does not substantially affect his capacity in this respect. *Rees v. Peyton*, *supra*.

**{¶ 63}** Berry is unquestionably a moderately intelligent man with demonstrated reasoning ability. He suffers from a mental disorder, but is in touch

with reality, and his mental disorder is not of such a nature as to preclude him from considering his options and making a voluntary, rational choice between them.

{¶ 64} Specifically, we find that Berry's rejection of his counsel's advice is not attributable to his mental disorder. Berry is not using his death sentence to fulfill a death wish produced by his disorder, as the Public Defender argues. Instead, he prefers freedom to death, but prefers a speedy execution to incarceration on death row during a protracted legal struggle. Moreover, he believes that, even if his lawyers succeed in having his conviction overturned, he will simply be retried and resentenced to death. We find that this belief of Berry's, whether well founded or not, is not the product of his mental disorder.

{¶ 65} We find that Berry understands the difference between life and death and fully comprehends the ramifications of his decision to forgo further legal proceedings. We find that he has the ability to choose means that relate logically to his ends. We find that he is capable of making a voluntary, knowing, and intelligent decision to forgo further legal proceedings, and that his decision to do so is in fact voluntary, knowing, and intelligent.

{¶ 66} Pursuant to the standard enunciated in *Rees v. Peyton*, *supra*, we find Berry competent to decide for himself whether to pursue or forgo further legal challenges to his conviction and death sentence.

## V. Claim of Judicial Bias

{¶ 67} The Public Defender claims that the trial judge who conducted the evidentiary hearing was predisposed to find Berry competent. The portions of the record cited by the Public Defender do not, in our view, support this accusation. We reject this claim and find that the trial judge conducted a full and fair evidentiary hearing.

## VI. Exclusion of Testimony

{¶ 68} The Public Defender further contends that the trial judge erred in excluding the testimony of attorney Alan Freedman regarding Berry's chances to

succeed in federal habeas corpus.[8]  We cannot agree.  The actual strength of Berry's possible federal claim is not at issue.  The question is whether Berry has the capacity to decide for himself whether to pursue those claims.  It is relevant to that determination whether Berry is able to listen to and consider his attorneys' opinion, but whether their opinion is right, wrong, or arguable is not relevant at all.  A competent person may choose to forgo even the strongest legal claim.[9]  Cf. *State v. Torrence* (1994), 317 S.C. 45, 47, 451 S.E.2d 883, 884, fn. 2:  "The test is not * * * whether the defendant in fact cooperates with counsel, but whether he has sufficient mental capacity to do so."

---

8.  According to Freedman's proffered testimony, Berry's confession, and perhaps other evidence as well, should have been suppressed on the ground that he was detained longer than forty-eight hours after his arrest without being brought before a judicial officer for a probable-cause determination.  See *County of Riverside v. McLaughlin* (1991), 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49.

9.  Even if the strength of Berry's *McLaughlin* claim were relevant, we would place little credence in Freedman's opinion.  First, it is far from clear that the exclusionary rule will be applied to freestanding *McLaughlin* claims.  See *Powell v. Nevada* (1994), 511 U.S. 79, 85, 114 S.Ct. 1280, 1284, 128 L.Ed.2d 1, 8, fn.* (expressly reserving question); 3 LaFave, Search and Seizure (3 Ed.1996) 48, Section 5.1(f).  Moreover, although *McLaughlin* is retroactive, see *Powell*, *supra*, the application of the exclusionary rule to *McLaughlin* claims "remain[ed] an unresolved question," 511 U.S. at 85, 114 S.Ct. at 1284, 128 L.Ed.2d at 8, fn.*, when Berry's conviction became final in 1995; therefore, the exclusionary rule may not be retroactively applicable to *McLaughlin* claims in habeas corpus.  See, generally, *Teague v. Lane* (1989), 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334.

    Finally, the court of appeals expressly held that Berry had waived his *McLaughlin* claim by failing to raise it in the trial court.  See *State v. Berry* (Oct. 21, 1993), Cuyahoga App. No. 60531, unreported, at 27, 1993 WL 425370.  We subsequently rejected the claim without specific explanation.  72 Ohio St.3d at 358, 650 N.E.2d at 438.  A federal court would "look through" our unexplained decision to the last explained state-court decision.  *Ylst v. Nunnemaker* (1991), 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706.  Here, the last explained state-court decision explicitly found a procedural default; such a finding generally precludes federal habeas review of a claim.  See, *e.g.*, *Engle v. Isaac* (1982), 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783, 801.

VII.  Claim that Postconviction Review Is Mandatory

**{¶ 69}** Finally, the Public Defender argues that Section 9, Article I of the Ohio Constitution requires collateral review of *all* capital cases, irrespective of the defendant's wishes and whether he is mentally competent or not.

**{¶ 70}** The clause cited states:  "Excessive bail shall not be required; nor excessive fines imposed; *nor cruel and unusual punishments inflicted*."  (Emphasis added.)  We think it extraordinary to contend that this clause, part of Ohio's basic law since 1802,[10] mandates the use of a form of action that did not exist until the General Assembly created it one hundred and sixty-three years later.  Even if the clause does give rise to procedural rights, there is surely nothing in the plain English of the clause that forbids a mentally competent person to waive those rights.

**{¶ 71}** The Public Defender's reading of the clause reflects a radical paternalism outside the mainstream of American law and inconsistent with the human dignity of a competent adult.  A competent criminal defendant may plead guilty to a charge even though he believes himself to be innocent.  *North Carolina v. Alford* (1970), 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162.  He may testify on his own behalf, or refuse to do so, against the advice of counsel.  *Jones v. Barnes* (1983), 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987, 993.  He may choose to do without counsel altogether, and represent himself.  *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562.  He may decide not to present any mitigating factors on his behalf in the penalty phase of a capital case.  *State v. Tyler* (1990), 50 Ohio St.3d 24, 27-29, 553 N.E.2d 576, 583-586; *People v. Lang* (1989), 49 Cal.3d 991, 1029-1031, 264 Cal.Rptr. 386, 411-412, 782 P.2d 627, 652-653; *People v. Silagy* (1984), 101 Ill.2d 147, 175-181, 77 Ill.Dec. 792, 806-809, 461 N.E.2d 415, 429-432.  However wise or foolish his decisions, they are his.

---

10.  See Section 13, Article VIII, 1802 Constitution.

**{¶ 72}** Our law generally refuses "to imprison a man in his privileges and call it the Constitution." *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 280, 63 S.Ct. 236, 242, 87 L.Ed. 268, 275. Therefore, absent a clear textual warrant for doing so—and we have none here—we cannot insert such a philosophy into the Ohio Constitution. "The same value that guarantees a defendant a right to present mitigating evidence—'the right of the defendant to be treated with dignity as a human being' * * *—also gives him the right to decide what is in his own best interest." *State v. Tyler*, *supra*, 50 Ohio St.3d at 29, 553 N.E.2d at 585, quoting Bonnie, The Dignity of the Condemned (1988), 74 Va.L.Rev. 1363, 1383.

**{¶ 73}** Nothing in the Ohio Constitution requires us to make Berry "a pawn to be manipulated on a chessboard larger than his own case." *Lenhard v. Wolff* (1979), 443 U.S. 1306, 1312, 100 S.Ct. 3, 7, 61 L.Ed.2d 885, 890 (Rehnquist, Circuit Justice) (continuing stay of execution). Since he is mentally competent to decide for himself, "[t]o deny him that would be to incarcerate his spirit—the one thing that remains free and which the state need not and should not imprison." *Lenhard v. Wolff* (C.A.9, 1979), 603 F.2d 91, 94 (Sneed, J., concurring).

VIII. Conclusion

**{¶ 74}** We conclude, based on the hearing record, that Berry is competent, in that he has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation. *Rees*, *supra*. Furthermore, we hold that the Ohio Constitution does not compel us to force postconviction review upon a competent individual who has decided, for reasons of his own, not to seek it.

**{¶ 75}** We therefore order that the sentence of death heretofore imposed on Wilford Lee Berry, Jr., be carried into execution on March 3, 1998. An execution warrant will issue immediately.

*Judgment accordingly*.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.