Jennie FRANKLIN, et al., Petitioners,

v.

Rodney L. FRANCIS, Respondent.

No. C1–98–0136.

United States District Court,
S.D. Ohio,
Eastern Division.

Feb. 27, 1998.

J. Joseph Bodine, Jr., Jonathan A. Woodman, Ohio Public Defender Com'n, Columbus, OH, Laurence E. Komp, Ohio Public Defender's Office, Columbus, OH, Randall Lee Porter, State Public Defender Office, Fed. Death Penalty Resource Center, Columbus, OH, for Petitioners.

Simon Barry Karas, Ohio Atty. Gen., Columbus, OH, for Respondent.

## *OPINION AND ORDER*

MARBLEY, District Judge.

## I. INTRODUCTION

Petitioners, Jennie Franklin and Elaine Quigley (together "Petitioners"), the birth

mother and sister of Wilford Lee Berry ("Berry"), have filed with this Court a first petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2251, on behalf of Berry, who is presently scheduled to be executed by the State of Ohio at 9:00 p.m., Tuesday, March 3, 1998. In addition, Petitioners request this Court to issue a stay of the execution of Berry, and to hold an evidentiary hearing to determine Berry's competency to waive his right to federal post-conviction relief. Petitioners file these papers acting as "next friends" of Berry, pursuant to 28 U.S.C. § 2242.

This matter is before the Court on Petitioners' Motion for Stay of Execution (doc. 4), Petitioners' Motion for Evidentiary Hearing (doc. 5), Respondent's Memorandum in Opposition to Motion for Stay of Execution, and Petitioners' Reply Memorandum. The Court heard oral argument on these Motions on February 26, 1998 and took the matter under advisement to determine whether there is an adequate basis on which to stay the execution.

## II. STATEMENT OF FACTS

### A. *Procedural Background*

On December 13, 1989, the Cuyahoga County Grand Jury indicted Wilford Lee Berry, Jr. for aggravated murder, aggravated robbery and aggravated burglary in the death of Charles Mitroff, and the burglary of his bakery in Cleveland, Ohio, where Berry was employed. Berry was examined before trial by a court-appointed clinical psychologist, Dr. Robert W. Goldberg. After his examination, Dr. Goldberg determined that Berry was sane at the time of the killing and was competent to stand trial. Defense counsel therefore never raised the issue of Berry's competency, or the insanity defense.

On July 3, 1990, a jury found Berry guilty on all counts charged in the indictment. The mitigation phase of Berry's trial commenced on July 30, 1990. That morning, Berry's counsel raised for the first time the issue of his competency to proceed with the mitigation phase of his trial. In addition, defense counsel moved for a new trial on the basis of newly discovered evidence which he believed

would enable him to pursue a defense of not guilty by reason of insanity. Specifically, defense counsel claimed that he had recently discovered that Berry had withheld information as to a possible motive for the murder of Mitroff and that this act raised a question regarding his sanity. According to defense counsel, Berry had previously maintained that he killed Mitroff for "no reason." Berry's sister, Elaine Quigley, however, had recently told defense counsel that Mitroff had nearly hit her and her daughter with a delivery van, sometime prior to Berry's employment at Mitroff's bakery. Berry was now claiming, according to his counsel, that that incident motivated him to kill Mitroff.

More importantly, defense counsel claimed that the court-appointed clinical psychologist, Dr. Goldberg, had considered this information and altered his opinion as to Berry's competency to proceed. In addition, Dr. Goldberg suggested that this new information reflected on Berry's competency during the culpability phase of the trial. Thus, defense counsel also stated that Berry might not be competent enough to proceed with the mitigation phase. The trial court denied Berry's motion for a new trial and did not order a competency hearing. The case then proceeded to verdict and sentence without Berry ever having been adjudicated competent to stand trial.

At the mitigation phase of Berry's trial, Berry specifically asked the jurors to sentence him to death because he would not be any better able to cope with the outside world after spending twenty or thirty years in prison and would kill again if released. The jury recommended a death sentence, and the trial court judge accepted the jury's recommendation and imposed a single death sentence. Berry's conviction and death sentence were affirmed by the Court of Appeals and the Supreme Court of Ohio. *State v. Berry*, 72 Ohio St.3d 354, 650 N.E.2d 433 (1995).

After his direct appeal, Berry represented to the state courts that he wished to forego any further challenges to his conviction and sentence and that he desired to submit to the execution of his death sentence. The Ohio Public Defender, who had mandatorily repre-

sented Berry in his direct appeal, claimed that he was not mentally competent to make such a decision. The State of Ohio filed a motion for a competency hearing with the Supreme Court of Ohio, and that Court ordered an evaluation of Berry's competence. It also appointed Dr. Phillip J. Resnick to conduct the evaluation, and ordered him to apply the following standard:

> A capital defendant is mentally competent to abandon any and all challenges to his death sentence, including appeals, state post-conviction collateral review, and federal habeas corpus, if he has the mental capacity to understand the choice between life and death and to make a knowing and intelligent decision not to pursue further remedies.... The defendant must fully comprehend the ramifications of his decision, ... and must possess the 'ability to reason logically,' i.e., to choose 'means which relate logically to his ends.' ...

State v. Berry, 74 Ohio St.3d 1504, 659 N.E.2d 796 (1996).

Dr. Resnick examined Berry in April 1996. Berry was also examined by Dr. Robert W. Alcorn, who was agreed to by both the State and the Public Defender, and examined by Dr. Sharon Pearson, a psychologist who examined Berry on behalf of the Public Defender. Dr. Pearson spent 12 hours with Berry both interviewing and testing him. Dr. Alcorn interviewed Berry for 1½ hours but did not review any materials on Berry's mental health history. Dr. Resnick spent 2 3/4 hours interviewing Berry, reviewing his mental health history and reviewing Pearson's report. Drs. Resnick and Alcorn diagnosed a mixed personality disorder with schitzotypal, borderline and antisocial features. Subsequently, in June 1997, the Court of Common Pleas held a hearing on the issue of Berry's competence.

The State called Drs. Resnick and Alcorn at the competency hearing. Both of them found Berry to be competent. The Public Defender also called two witnesses at the competency hearing. Dr. Pearson, who found Berry incompetent to waive his rights, concluded that Berry suffered from schizo-

typal disorder, a rigid thought process, a tendency toward extreme isolation and withdrawal, and a tendency to have psychotic episodes under stress. Dr. Jeffrey L. Smalldon, a psychologist who never examined Berry and had no opinion as to his competence, testified generally regarding schizotypal personality disorder and its relevance in determining a person's competence.

After hearing the evidence, the trial judge issued an Order on July 22, 1997, which found that, while he suffers from a mixed personality disorder with schizotypal, borderline and antisocial features, Berry "is competent to forego any and all further legal challenges."[1] After reviewing the record and considering the arguments of the State and the Public Defender, the Supreme Court of Ohio, on December 3, 1997, also found that Berry was competent to forego all further reviews of his conviction and sentence. See State v. Berry, 80 Ohio St.3d 371, 686 N.E.2d 1097 (1997). The court ordered that the death sentence be executed on March 3, 1998.

On September 5, 1997, Berry was assaulted by inmates housed in his cell block who had gained control in a riot. Berry's jaw and facial bones were badly broken during the assault and required surgery and metal implants to repair the damage. Berry's right hand was also heavily damaged because he used it in an attempt to protect the back of his head from blows inflicted by a heavy padlock swung on a chain. Berry also suffered several broken ribs, bruised internal organs and required staples in his head. According to the Public Defender, Berry was rendered unconscious by the beating. None of the information related to the beating was considered by any of the mental health professionals who had examined Berry, and the Public Defender's request for an additional evaluation after the beating was denied by the Supreme Court of Ohio. State v. Berry, 80 Ohio St.3d 1402, 684 N.E.2d 335 (1997).

It has been more than eight months since the State's competency hearing at the trial court was held. It has been almost three

---

**1.** Other evidence available to the Court regarding Berry's mental condition included Dr. Goldberg's reports and evidence relating to Berry's mental problems as an adolescent.

months since the Supreme Court of Ohio's review and approval of the trial court's judgment of competency.

### B. *Berry's History of Mental Disturbances*

Berry endured a childhood replete with physical and emotional trauma, some of which have evolved into more troublesome mental and physical illnesses. His mother, who once beat him with an extension cord out of frustration, was diagnosed with bipolar disorder. His father, who left the family when Berry was but a year old, was a diagnosed schizophrenic and passed away in a mental institution from a degenerative brain disease. Berry was also sexually molested at a young age by the teenage children of his babysitter, and his mentor in a Big Brother program made sexual advances toward him.

Berry has also suffered from blackouts and hallucinations from a young age. He has hallucinations of despair and dying, and fights to the death with a "lady in black," who represented Evil and defeated Berry. Berry is susceptible to auditory hallucinations, hearing two voices at times, each telling him to do something different. Although tests for seizure disorder have been inconclusive, both Berry and his mother recall several episodes where Berry developed uncontrollable shakes or amnesia.

Berry has a long history of suicide attempts, the earliest occurring at age 9, when he overdosed on his hyperactivity tranquilizers. Berry later overdosed on aspirins and rat poison, and attempted to slash his wrists while in prison in Texas. His desire to die also manifested itself when he volunteered to confess to the Kentucky police if they would guarantee him the death penalty.

### C. *Berry's Evaluation by Mental Health Experts*

#### 1. Examination by Dr. Robert Goldberg

On two separate occasions, Berry was examined by Dr. Goldberg. Several months before trial, Goldberg examined Berry and found him to be suffering from considerable emotional disturbance. Dr. Goldberg concluded that, as of the time of the examination, Berry could be considered technically, chronically, borderline schizoid or maybe even schizophrenic, but, nevertheless, sane at the time of the murder and competent to stand trial.

During a second examination, on June 23, 1990, however, Dr. Goldberg observed stronger symptoms of psychosis which were attributable to stress. Dr. Goldberg later testified that Berry claimed to have been sexually molested by babysitters in his youth, and was susceptible to auditory hallucinations. Goldberg diagnosed Berry as suffering from a "psychotic disorder not otherwise specified, a typical psychosis," and a "personality disorder mixed with what are called schizotypal, borderline and antisocial features." Goldberg explained to the jury that there was probably a genetic component to Berry's psychological problems, given that Berry's father suffered from mentally illness, and died in a mental institution of degenerative brain disease.

#### 2. Examination by Dr. Sharon Pearson

Dr. Pearson spent the most time evaluating Berry. Evaluating him over a span of three visits, Dr. Pearson reached the same general conclusion as Drs. Resnick and Alcorn—that Berry suffered from a mixed personality disorder, with schizotypal, borderline, and antisocial features. However, Dr. Pearson concluded that Berry was incompetent to waive his rights to post-conviction relief, even under the standard mandated by the trial court. She believed that Berry's mental disorder, which is common among first degree relatives of schizophrenics caused him to suffer from "rigid thought process." The effect of this result from his schizotypal disorder, said Dr. Pearson, was to render Berry psychologically incapable of absorbing information from his attorneys if such information conflicted with any preconceptions. Thus, Dr. Pearson opined that because Berry was unable to take in necessary and pertinent information, he was unable to make a knowing waiver of his rights.

#### 3. Examinations by Drs. Robert Alcorn and Phillip Resnick

On March 7, 1996, Dr. Alcorn examined Berry for approximately 1.5 hours. He did not review any background material on Ber-

ry, instead relied on information set forth in the report of Dr. Pearson.

On April 22, 1996, Dr. Resnick examined Berry. Dr. Resnick explained to Berry that the purpose of the interview was to offer an opinion about whether Berry was competent to waive any further appeals and post conviction relief. Berry understood this and agreed to proceed with the examination under the condition he, Berry, would not discuss his background and past experiences. Berry stated that the only relevant issue was whether he was currently competent to waive his appeals. Dr. Resnick attempted to explain how background information was relevant to an opinion about current competence, but Berry was adamant in his refusal to discuss his background.

Drs. Alcorn and Resnick diagnosed Berry with a mixed personality disorder, with schizotypal, borderline, and antisocial features. Neither doctor found any evidence of psychosis. Under the standard set forth by the Ohio Supreme Court, both doctors found that Berry had the mental capacity to waive his rights to all post-conviction relief.

#### 4. Affidavit of Douglas Mossman

Dr. Mossman's affidavit was submitted to the Court as an exhibit to Petitioner's Motion for an Evidentiary Hearing. While he did not personally examine Berry, Dr. Mossman reviewed voluminous materials related to all of Berry's examinations. Dr. Mossman concluded that with reasonable medical certainty, the documents he reviewed leave open a substantial probability that Berry's waiver is not a competent waiver. The issue remains open because Dr. Mossman believes that the evaluations of Drs. Resnick, Alcorn and Pearson failed to consider certain factors critical to the assessment of Berry's competence.

In particular, Dr. Mossman stated that Drs. Resnick and Alcorn's reports and testimony leave open specific issues of whether Berry appreciates that his decision entails waiving appeals that his attorneys think could be successful in gaining his release, and whether Berry's failure or refusal to appreciate this fact is a manifestation of a mental disorder. Dr. Mossman further opined that while Drs. Resnick and Alcorn established

that Berry knew the difference between life and death and that his chosen course would result in execution, they failed to establish whether Berry's mental condition substantially affected his capacity to waive or forego the legal challenges at issue.

### III. DISCUSSION

#### A. A Next Friend Action

■■■ This Court's habeas corpus jurisdiction extends only to actions brought by or **on behalf of** a person in custody. 28 U.S.C. § 2242. In a next friend action, the next friend sues on behalf of the person in custody, who remains the real party in interest. Fed.R.Civ.P. 17. Venue over the next friend action properly lies in this Court because Berry is presently incarcerated within the district. 28 U.S.C. § 2241(d). Petitioners' next friend claim, therefore, on its face, properly comes within this Court's jurisdiction.

#### B. Standard for Granting a Stay

■■■ At this stage, it must be noted that Petitioners request only a stay of the execution so that an evidentiary hearing on competence may be held to determine Berry's competence to waive his right to prosecute further appeals. The federal habeas corpus statute grants any federal judge "before whom a habeas corpus proceeding is pending" power to stay a state court action "for any matter involved in the habeas corpus proceeding." 28 U.S.C. § 2251. While it is unquestionable that a federal court always has jurisdiction to decide the issue of its own jurisdiction, see, 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3536 (1984); *United States v. United Mine Workers of America,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), this Court is mindful that there are limitations on even this power. The Supreme Court has stated that a federal court "must make certain that an adequate basis exists for the exercise of federal power" before granting a stay. *Demosthenes v. Baal,* 495 U.S. 731, 737, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990). However, this Court is also mindful that, because of the "obviously irreversible nature of the

death penalty," a United States District Court should resolve all doubts as to legal issues in favor of granting a stay. *See, e.g., Evans v. Bennett,* 440 U.S. 1301, 1303–04, 1306, 99 S.Ct. 1481, 59 L.Ed.2d 756 (1979). In this case, Petitioners must come forward with "meaningful evidence of incompetency" before they are entitled to a stay and the requested evidentiary hearing. *Baal,* 495 U.S. at 736–37. Finally, section 2251 "dedicates the exercise of stay jurisdiction to the sound discretion of a federal court." *McFarland v. Scott,* 512 U.S. 849, 857–58, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994).

### C. *Next Friend Standing*

In determining whether to grant a stay, however, this Court is faced with the question of whether petitioners have standing to proceed as "next friends," i.e., whether they are "entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Petitioners' theory of standing is premised upon their claim that Berry's refusal to act on his own behalf is due to his mental incompetency. Petitioners' theory of standing in this context is not without precedent.[2] Nonetheless, "the number of cases which concern next-friend filing in death penalty cases are few." *Wilson v. Lane,* 697 F.Supp. 1489, 1497 (S.D.Ill.1988). More importantly, while another district court in this Circuit has faced this issue,[3] the issue of "next friend" standing is one of first impression in this Circuit. Despite the paucity of jurisprudence in this area, the Supreme Court of the United States has established conditions that must be met by those seeking a stay premised upon "next friend" standing.

In *Whitmore v. Arkansas,* 495 U.S. 149, 165, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), the Supreme Court held that "one necessary condition for 'next friend' standing in federal court is a showing by the proposed 'next friend' that the real party in interest is unable to litigate his own cause due to mental incapacity." A second prerequisite is that the "'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." *Id.* at 163. The burden is on the next friend "clearly to establish the propriety of his status and thereby justify the jurisdiction of the court." *Id.* at 164.

In this case, the parties do not dispute that Petitioners, Berry's mother and sister, meet the second prerequisite. However, the Respondent argues that Petitioners have failed to meet the first prerequisite to establish next friend standing because Berry was determined to be competent to waive his right to pursue post-conviction relief after a competency hearing was held in the state trial court. In addition, that determination of competency was later reviewed and approved by the Supreme Court of Ohio. *State v. Berry,* 80 Ohio St.3d 371, 686 N.E.2d 1097 (1997). In order to determine whether Petitioners can meet the first prerequisite, then, this Court must consider whether it is bound by the state court's finding of competency.

### D. *Standard of Review*

Respondent's argument that this Court is bound by the state court's finding of competency is premised upon the Supreme Court's holding in *Whitmore.* In *Whitmore,* the Supreme Court held that the first "prerequisite for 'next friend' standing is not satisfied

**2.** *Demosthenes v. Baal,* 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990); *Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Evans v. Bennett,* 440 U.S. 1301, 99 S.Ct. 1481, 59 L.Ed.2d 756 (April 5, 1979) (Rehnquist, J., Opinion in Chambers); *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966); *In re Moser,* 69 F.3d 690 (3d Cir.1995); *Wells v. Arave,* 18 F.3d 656 (9th Cir. 1994); *Brewer v. Lewis,* 989 F.2d 1021 (9th Cir. 1993); *Rumbaugh v. Procunier,* 753 F.2d 395 (5th Cir.1985), *cert. denied,* 473 U.S. 919, 105 S.Ct. 3544, 87 L.Ed.2d 668 (1985) (Marshall, J. and Brennan, J., dissenting); *Rumbaugh v. McKaskle,* 730 F.2d 291 (5th Cir.1984); *Lenhard v. Wolff,* 603 F.2d 91 (9th Cir., 1979), *on applications for stay of execution,* 443 U.S. 1306, 100 S.Ct. 3, 61 L.Ed.2d 885 (Sept. 7, 1979) (Rehnquist, J., Opinion in Chambers), 444 U.S. 807 (October 1, 1979) (Marshall, J, and Brennan, J., dissenting); *Minerva v. Singletary,* 830 F.Supp. 1426 (M.D.Fla.1993); *Smith v. Armontrout,* 632 F.Supp. 503 (W.D.Mo.1986), *aff'd,* 812 F.2d 1050 (8th Cir.1987); *Groseclose v. Dutton,* 589 F.Supp. 362, (M.D.Tenn.1984); *Rumbaugh v. Estelle,* 558 F.Supp. 651 (N.D.Tex.1983).

**3.** *Groseclose,* supra.

where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded." *Whitmore*, 495 U.S. at 165. Respondent further argues that the Supreme Court's holdings in *Maggio v. Fulford*, 462 U.S. 111, 117, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983), and *Demosthenes v. Baal*, supra at 735, establish that a state court's determination of a defendant's competency on the merits is entitled to a presumption of correctness on federal habeas review. According to those cases, that presumption can be sufficiently rebutted if a federal court concludes that the determination is not "fairly supported by the record. See 28 U.S.C. § 2254(d)(8)." *Baal*, 495 U.S. at 735.

However, the statute upon which the Court in both *Maggio* and *Baal* relied for those holdings has since been amended by Congress. In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which became effective on April 24, 1996, and which, among other things, amended 28 U.S.C. § 2254(d) to provide a new standard of review for federal habeas claims.[4] Under the previous version of the statute that was relied upon in *Baal* and *Maggio*, federal courts that were asked to consider habeas corpus claims that had been previously determined by state courts conducted a *de novo* review over both questions of law, and mixed questions of law and fact. *Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); *see also Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir.1997). However, state court factual findings were entitled to a presumption of correctness unless the petitioner could establish one or more of eight exceptions that were expressly set forth in the statute. 28 U.S.C. § 2254(d) (1995). The "[not] fairly supported by the record" exception was expressly provided by Congress in the statute.

As amended, however, 28 U.S.C. § 2254(d) (1996) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claims—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "fairly supported by the record" language expressly relied upon by both *Maggio* and *Baal* is noticeably absent from the statute as amended. However, Congress also added a paragraph to the statute which read:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1) (1996). While this paragraph carries forth the "presumption of correctness" that was present in the previous statute and that was expressly relied upon by the Court in *Maggio* and *Baal*, the "[not] fairly supported by the record" exception to the presumption is, again, noticeably absent. Thus, this Court is bound by the 1996 amendments § 2254 rather than the "not fairly supported by the record" standard that governed in *Maggio* and *Baal*.

Neither the Supreme Court nor the Sixth Circuit Court of Appeals has definitively explained how federal courts should implement this new statute, or the new standard of review that it mandates. *See Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir.1997). However, in *Harpster*, the Sixth Circuit explored two different approaches of review that have been developed in its sister circuits. One approach, adopted by the Fifth and Seventh Circuits, requires a district court to decide

---

4. These 1996 AEDPA amendments to § 2254(d) govern petitions, like this one, that were filed after April 24, 1996. *Lindh v. Murphy*, — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

whether the issue presented is a question of law, question of fact, or mixed question of law and fact, in order to determine which part of § 2254(d) governs its review. *Id.* (citing *Drinkard v. Johnson,* 97 F.3d 751, 767–68 (5th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997), and *Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1996), *rev'd on other grounds,* — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). Under this approach, pure questions of law are governed by the "contrary to" clause of § 2254(d)(1), while mixed questions of law and fact are governed by the "unreasonable application of" clause in § 2254(d)(1), while mixed questions of law and fact are governed by the "unreasonable application of" clause in § 2254(d)(1). Section 2254(d)(2) controls pure questions of fact. *Harpster,* 128 F.3d at 326.

The Sixth Circuit went on to contrast the approach adopted by the First Circuit, which does not begin with or turn upon the categorization of the issue into a question of law, question of fact, or mixed question of law and fact. *Id.* at 327 (citing *Martin v. Bissonette,* No. 96–1856, 1997 WL 280602, *9 (1st Cir. May 29, 1997), *withdrawn and new opinion issued,* 118 F.3d 871 (1st Cir.1997)). The First Circuit rejected the "categorization" approach adopted by the Fifth and Seventh Circuits because, while an earlier draft of the AEDPA contained that approach, the final version did not. *Harpster,* 128 F.3d at 327 (citing *Bissonette,* at *9 n. 9 (comparing initial draft and final version of AEDPA)). Under the approach adopted by the First Circuit, a federal habeas corpus court first determines whether clearly established Supreme Court precedent compels an outcome to the issue at hand. *Harpster,* 128 F.3d at 327. If not, the court determines whether the state court decision involved an unreasonable application of Federal law as established by the Supreme Court. *Id.*

The Sixth Court did not explicitly address in *Harpster* which approach it would follow because "[t]he difference between the two approaches ha[d] no practical significance in [that] case." *Id.* at 327. If the difference

between the two approaches has any practical significance in this case—which presents the question of whether the state courts' finding of mental competency under *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1996), is binding upon this Court—this Court is more persuaded by the legislative interpretation underlying the second approach, and would follow that approach. However, like the Sixth Circuit in *Harpster,*[5] this Court believes that the difference between the two approaches has no practical significance in this case because it is first and foremost bound by the words used by Congress in 28 U.S.C. § 2254(d). Accordingly, as the *Harpster* Court explained, under either approach, we must decide whether the state court's resolution of the issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1996); *Harpster,* 128 F.3d at 327. This Court must, therefore, next examine the state court's decision finding Berry competent.

**E. *The State Court's Contrary Interpretation and Unreasonable Application of the Rees Standard***

In *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), the Supreme Court articulated what has become the standard by which an individual is deemed competent or incompetent to assert his rights for purposes of conferring standing on next-friend petitioners. The Court framed the issue as:

> [W]hether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand, whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

*Id.* at 314.

■ Thus, on the one hand, if the individual "has capacity to appreciate his position

---

**5.** Like the issue that was involved in *Harpster,* the issue here—mental competency—is a mixed

question of law and fact. *Levine v. Torvik,* 986 F.2d 1506, 1514 (6th Cir.1993).

and make a rational choice with respect to continuing or abandoning further litigation," then he is competent to waive collateral federal review, and next-friend petitioners do not have standing to petition on his behalf. *Id.* On the other hand, if "he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises," then he is incompetent, and the federal courts have jurisdiction to entertain next friend petitions. *Id.* (emphasis added).

Respondent argues that the Supreme Court of Ohio properly interpreted and applied this standard from *Rees* in its finding that Berry was competent to waive his appeals. This Court disagrees. While in one sense, the *Rees* standard as articulated by the Supreme Court appears to require only one inquiry, when examined closely, and as applied, the standard necessarily requires two inquiries.

■ While the state court was faithful to the first inquiry of the *Rees* standard, it eviscerated the second inquiry of that standard by removing the "may substantially affect" language, and in so doing, rendered the *Rees* Court's language meaningless. The state court's decision, in other words, "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," and "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States." Thus, the state court's decision is not binding on this Court under 28 U.S.C. § 2254(d)(1).

It is abundantly evident from the decision of the Supreme Court of Ohio, which ultimately found Berry competent, that it understood at that time that the Rees standard of competence governed the matter. *Berry,* 80 Ohio St.3d at 374, 686 N.E.2d 1097. However, when the Supreme Court of Ohio initially articulated the standard by which the trial court was to conduct the competency hearing, it did not properly articulate the *Rees* standard. *Berry,* 74 Ohio St.3d at 1504, 659 N.E.2d 796. Rather, the standard of competence articulated by the Supreme Court of Ohio at that time was consistent with the

first inquiry of *Rees,* but glaringly ignored the second inquiry:

> A capital defendant is mentally competent to abandon any and all challenges to his death sentence ... if he has the mental capacity to understand the choice between life and death and to make a knowing and intelligent decision not to pursue further remedies. The defendant must fully comprehend the ramifications of his decision, and must possess the 'ability to reason logically,' i.e., to choose 'means which relate logically to his ends.'

*Berry,* 80 Ohio St.3d at 371, 686 N.E.2d 1097 (citing its earlier decision at 74 Ohio St.3d 1504, 659 N.E.2d 796). Thus, the trial court conducted the competency hearing under this inadequate standard of competence, and the mental health experts who gathered the evidence by evaluating Berry also did so under this inadequate standard. After making its determination of competence under this inadequate standard, however, the trial court returned the matter to the Supreme Court of Ohio for further proceedings.

In its decision reviewing and agreeing with the trial court's determination, the Supreme Court of Ohio for the first time (at the prompting of the Public Defender) correctly articulated the *Rees* standard. *Berry,* 80 Ohio St.3d at 374, 686 N.E.2d 1097. However, before it applied the correct *Rees* standard to the evidence presented to the trial court, the Ohio Supreme Court explicitly altered the second inquiry of the standard. Relying on a similar interpretation handed down by the Eighth Circuit Court of Appeals in *Smith v. Armontrout,* 812 F.2d 1050 (8th Cir.1987), the Supreme Court of Ohio expressly and effectively read the "may substantially affect" language, and thus, the entire second inquiry, out of the *Rees* standard:

> We ... reject the notion that the bare possibility of a mental disorder's substantially affecting the condemned's decision making capacity is enough to require a finding of incompetence. *Ultimately, the question is not whether a defendant 'may' lack the capacity to make a rational choice, but whether he in fact has that capacity.*

*Berry,* 80 Ohio St.3d at 375, 686 N.E.2d 1097 (emphasis added). This language clearly indicates that the Supreme Court of Ohio's competency determination was bound in the incorrect reasoning that if a defendant has the capacity to make a rational choice, he cannot also suffer from a mental disorder that "may substantially affect" that capacity. However, the United States Supreme Court's express language in *Rees* and a deeper look at the rationale underlying that language indicate the fallacy of the state court's reasoning.

In order for a condition to affect a person's ability to perform an act, the person must first have the ability to perform that act. If that person does not have the ability to perform the act in the first place, there is nothing to be affected. Thus, if a person is incapable of making a rational choice for whatever reason, then the second inquiry required by the *Rees* standard need not be performed. The person's incapacity renders him incompetent per se. If, however, it is first determined that a person has the ability to perform an act, like the capacity to make a rational choice, then, and only then, can it also be determined whether that person has a mental condition which affects that ability in some way.

■ To give any real meaning to the *Rees* Court's holding requires a fidelity to its words. *See, e.g., Heidnik v. Horn,* 112 F.3d 105 (3d Cir.1997) (rejecting a state court's finding of competence because it failed to follow and properly apply the *Rees* standard). Thus, if the first inquiry results in a finding of capacity, then the second inquiry into the existence of a mental condition and its effect must be performed. Only if the second inquiry into the existence and effect of a mental condition results in a conclusion that the condition exists, and that it "may substantially affect" a person's capacity to make a rational choice, is the person to be determined incompetent. If the evidence demonstrates that the person's mental condition may only minimally or insignificantly affect that person's capacity to make a rational choice, then no determination of incompetency is warranted.

This Court is under a duty to believe that the Supreme Court of the United States not only knows the meaning of the word "may," but also means "may" when it uses the word "may." After all, the *Rees* Court did not say that the inquiry into competence should be limited to only whether or not a person is capable or incapable of making a rational choice. The second inquiry requires more. The second inquiry, properly and literally interpreted, is a precautionary test, one guided by prudential concerns which are eminently appropriate in the context of this particular inquiry: capacity to relinquish a known right, e.g., the right to pursue an appeal, when faced with death.

Our Supreme Court has consistently applied the utmost caution when determining that a person has knowingly, intelligently, and voluntarily waived a Constitutional right. This Court must assume that the *Rees* standard was crafted with full knowledge that the questions of the existence of a mental condition, and the degree of effect that a mental condition has on a person's capacity for rational thought is a difficult one to answer definitively. While mental health experts may opine on the matters, even the best educated experts can almost certainly be expected to disagree. Indeed, even under the incorrect legal standard used in this case by the mental health experts and the state courts, the three mental health experts who testified on competency disagreed.

In this context, the *Rees* Court crafted a standard that required a court to determine whether there is enough evidence of an affecting condition that it is possible that the condition "may substantially affect" the person's capacity. *See, e.g., Rumbaugh v. Procunier,* 753 F.2d 395, 405 (5th Cir.1985) (J. Goldberg dissenting). Put another way, if the evidence of an affecting condition is serious enough to raise a substantial doubt as to the unfettered capacity of the person to make a rational choice, then the *Rees* standard requires a court to, in the exercise of caution and for the protection of that person's Constitutional rights, find the person to be incompetent. This cautionary standard reflects the obvious fact that, by finding a person incompetent to waive his right to

abandon or proceed with further litigation of Constitutional claims, a court is merely affording that person the opportunity to have his Constitutional claims fully reviewed and ruled upon prior to being subjected to the most obviously irreversible penalty that exists—death. Therefore, the cautionary standard explicitly articulated by *Rees* makes perfect sense in this context, and was improperly altered and applied by the Supreme Court of Ohio.

In *Berry,* the Supreme Court of Ohio was improvidently persuaded by the "straw man" argument put forth and rejected by the Eighth Circuit Court of Appeals in *Armontrout.* The *Rees* standard properly and literally interpreted does not mean, as the Supreme Court of Ohio suggested, that "if there exists even a [mere or bare] possibility that Berry's mental disorder has affected his decision making capacity in any way and to any degree, this court must find him incompetent." *Berry,* 80 Ohio St.3d at 374–75, 686 N.E.2d 1097. Rather, a petitioner seeking next friend standing for a defendant must present enough evidence of an affecting mental condition to demonstrate that the condition may substantially affect the defendant's capacity to make a rational choice. Then, and only then, is a finding of incompetency mandated by *Rees.*

■ The manner in which a disorder affects a person's decision-making capacity and to what "degree" are exactly the inquiries mandated by *Rees.* Therefore, factual findings of how a condition "may" affect a person's capacity, and to what degree, are required under *Rees.* By reading this language out of the *Rees* standard, the Supreme Court of Ohio ignored the requirements of *Rees,* and precluded the development of the factual findings necessitated by the *Rees* standard. Thus, the *Berry* decision was both contrary to *Rees* and an unreasonable application of the *Rees* standard. *See, e.g., Levine v. Torvik,* 986 F.2d 1506 (6th Cir.1993) (rejecting state court's competency determination on basis that state court relied upon and applied wrong legal standard, which prevented proper factual record from being developed).

In addition, this Court finds a stark contrast between the rationale set forth by the *Armontrout* court and adopted by the Supreme Court of Ohio in *Berry* and the clearly established Federal law as determined by the Supreme Court of the United States in *Ford v. Wainwright,* 477 U.S. 399, 409–10, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). Specifically, the underlying *Armontrout/Berry* rationale, which states "we think it very probable ... that in every case where a death-row inmate elects to abandon further legal proceedings, there will be a possibility that the decision is the product of a mental disease, disorder, or defect," 812 F.2d at 1057, 80 Ohio St.3d at 375, is untenable in light of the holding of *Wainwright:*

> [T]he natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today. And the intuition that such an execution simply offends humanity is evidently shared across the Nation. Faced with such widespread evidence of a restriction upon sovereign power, this Court is compelled to conclude that the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane.

Indeed, the *Wainwright* rationale appears to be guided by the very same reason that the prudential and cautionary test of *Rees* was adopted in the first place.

Respondent argued at oral argument that the Supreme Court's holdings in both *Whitmore* and *Baal* comports with the *Berry* court's reading of *Rees.* However, this Court does not read either case so broadly. Whether the *Rees* standard was properly interpreted and applied by the state court was not an issue in, much less even addressed in, either decision. The *Baal* Court did not mention the Rees standard, much less alter it. And the *Whitmore* Court merely made a shorthand reference to *Rees,* which cannot properly be interpreted as an alteration of that holding. Indeed, in the *Whitmore* case, there does not appear to have been any evidence of the existence of an affecting mental condition in the defendant at all. Therefore, there was "no reason to disturb" the competency determination of the state court. *Whitmore,* 495 U.S. at 161–66.

■ Thus, this Court finds that the Supreme Court of Ohio's decision in *Berry* was

contrary to clearly established Federal law, as determined by the Supreme Court of the United States. Consequently, the competency determination is not binding on this Court in habeas review. 28 U.S.C. § 2254(d). In addition, this Court finds that the Supreme Court of Ohio's decision in *Berry* involved an unreasonable[6] application of clearly established Federal law, as determined by the Supreme Court of the United States. *Id.* Under this newly enacted standard of review, Congress has restrained this Court from relying upon the Eighth Circuit's opinion and reasoning in *Armontrout,* even if it agreed with the reasoning, which it does not. Rather, this Court is obligated to rely only upon the Supreme Court of the United States' clearly established determination of the Federal law governing incompetency to waive review of Constitutional claims. *Rees* clearly established this law, and the Supreme Court of Ohio failed to follow it, incorrectly modified it, and unreasonably applied it.[7]

**F. *The Effect of the Supreme Court of Ohio's Unreasonable Application of And Adoption of the Incorrect Standard under Rees.***

1. The factual finding of competence was an unreasonable determination in light of the evidence presented.

■ Respondent also argues that, even if the Supreme Court of Ohio misinterpreted and unreasonably applied the *Rees* standard, this Court is still bound by the factual findings of the Supreme Court of Ohio which relate to the competency issue. Specifically, the Supreme Court of Ohio adopted the opinions of both Drs. Resnick and Alcorn to find Berry competent. That is, the Supreme Court of Ohio agreed with both doctors' findings that Berry has the mental capacity to understand the choice between life and death, as well as the ability to choose "means which relate logically to his ends." Thus, Respondent argues, this Court need not hold its own evidentiary hearing, but must simply apply these factual findings of competence under the proper *Rees* standard. This Court, however, disagrees.

Because both doctors' findings were improperly restricted to only the first inquiry of *Rees* —whether Berry has the mental capacity to make a rational choice—the Supreme Court of Ohio's reliance on those findings to determine competency was similarly improper and unreasonable. First, every doctor in this matter who has examined Berry or reviewed his records agrees that Berry suffers from a diagnosable mental disorder—a mixed personality disorder with schizotypal, borderline and antisocial features. In addition, the doctors relied upon by the Supreme Court of Ohio found that Berry had the capacity to make rational choices. However, neither

---

**6.** This Court is cognizant that there are two different approaches being developed and debated as to what constitutes an "unreasonable" application of clearly established Federal law, and that the Sixth Circuit has not yet addressed this question. However, this Court is persuaded by the reasoning and decision of its sister court in *Nevers v. Killinger,* 990 F.Supp. 844 (E.D.Mich. 1997), which declined to follow the unworkable and unreasonable approach of the Fifth and Ninth Circuits, as set forth in *Drinkard v. Johnson,* 97 F.3d 751, 768–69 (5th Cir.1996), and *Jeffries v. Wood,* 114 F.3d 1484, 1500 (9th Cir. 1997). Instead, the *Nevers* court was guided by the Seventh's Circuit approach in *Hennon v. Cooper,* 109 F.3d 330, 335 (7th Cir.1997), which held that a reasonable determination is one which is "consistent with the facts and circumstances of the case." Like the *Nevers* court, this Court believes that Judge Garza's dissent in *Drinkard,* 97 F.3d at 777, put it best:

The determination of reasonableness must consider only the propriety and correctness of the state court's actions in the context of federal guarantees established by the Supreme Court. If a federal court 'disagrees' with the state court's application of federal law—if it finds that the state court unreasonably applied the law of the land—that federal court must grant habeas relief under § 2254(d)(1).

**7.** Even if this Court were not now restricted to the case law of the Supreme Court of the United States in reviewing a petitioner's habeas claim, and could therefore rely upon decisions of inferior federal tribunals interpreting "Federal law," this Court would not find the *Armontrout* decision persuasive. And while the Sixth Circuit has yet to definitively interpret and apply the *Rees* standard in this context, a sister district court in this Circuit has applied it, and done so persuasively. See *Groseclose v. Dutton,* 594 F.Supp. 949 (M.D.Tenn.1984) (citing *Rees* in granting a stay and evidentiary hearing where the evidence and standard employed comports with the literal wording of the *Rees* standard).

doctor relied upon by the Supreme Court of Ohio made inquiries into or factual findings specifically about what effect Berry's condition "may" have upon his decision-making capacity. Because these findings were absent, neither doctor made inquiries into or factual findings about to what degree Berry's disorder "may" affect his mental capacity.

Instead, both doctors determined that Berry's condition *does* not substantially affect his mental capacity. But both doctors admitted that this finding was determined only within the legal standard of competency that the Supreme Court of Ohio had directed them to follow. That standard, as discussed above, rendered entirely meaningless the second inquiry of the *Rees* standard and limited the standard to merely the first inquiry. In sum, from the doctors' own testimony, it is clear that their findings of competency—that Berry's mental disorder does not substantially affect his decision-making competency—were made only in accord with the incorrect legal standard provided by the Supreme Court of Ohio.

That incorrect legal standard held, in essence, that determining whether a person has the capacity to make a rational choice is the same inquiry as determining whether a mental disorder may substantially affect that capacity. The doctors' opinions of competency were made under the incorrect legal standard, and that standard was premised upon the faulty logic that finding rational decision-making capacity in a person necessarily precludes the possibility that that capacity "*may* " be substantially affected by a mental disorder. *Rees* does not so hold. Under *Rees*, the doctors' failure to inquire into and opine on the facts necessary for the second *Rees* inquiry rendered the evidence presented insufficient to determine competency. Therefore, the Supreme Court of Ohio's decision of competency under *Rees* was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2) (1996).

### 2. *Need for an evidentiary hearing under the proper Rees standard*

▉ Because the doctors' evaluations of Berry were limited to discovering only evidence which would relate to the first inquiry

of *Rees*, an evidentiary hearing is necessary in this Court to develop the factual basis required to determine the second inquiry of the *Rees* standard. This Court is mindful that § 2254(c)(2) of the AEDPA habeas amendments restricts this Court from holding an evidentiary hearing on a claim, with some narrow exceptions, "[i]f the applicant has failed to develop the factual basis of a claim in State court." Under the statute, however, an evidentiary hearing is warranted in this case because: (1) it is not the Petitioners here who "failed" to develop the record, but rather, the Supreme Court of Ohio's incorrect legal standard precluded all those involved from properly developing the record; (2) all of the facts needed under *Rees* to adjudicate the constitutional claim of Berry's competency to waive his right to pursue post-conviction relief are not before this Court; and (3) a "reasonable" jurist could conclude, based upon the conflict in the existing evidence on competency, that there is "meaningful evidence" of incompetency. *See, e.g., Burris v. Parke*, 116 F.3d 256, 258–59 (7th Cir.1997); *Brewer v. Marshall*, 941 F.Supp. 216, 228–29 (D.Mass.1996), *rev'd in part*, 119 F.3d 993 (1st Cir.1997).

### 3. *Presence of colorable federal claims*

Petitioners seek a stay so that this Court can determine the competency of Berry under the correct *Rees* standard, and thus, necessarily determine the petitioners' claim for next friend standing. Petitioners seek next friend standing ultimately in order to have this Court review on the merits Berry's Constitutional claims which they raise in the petition for habeas corpus. Petitioners recognize that the Supreme Court has stated that a stay of execution should be denied "where a habeas petition fails to raise a substantial federal claim." *McFarland v. Scott*, 512 U.S. 849, 856, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994). Justice O'Connor stated this threshold in another way: "our cases have made it clear that capital defendants must raise at least some colorable federal claim before a stay of execution may be entered." *Id.* at 860. This Court is satisfied that Petitioners have met this threshold with both their claims under *Drope v. Missouri*,

420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) and *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

### a. The *Drope* claim

 Due process requires that a legally incompetent defendant cannot stand trial. A defendant is not competent to stand trial if he lacks "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Petitioners argue that the evidence before the trial court on July 30, 1990, created sufficient doubt of Berry's competence so as to require the trial court to conduct a hearing.

 Due process requires a competency hearing if there is "sufficient doubt of his competence to stand trial so as to require further inquiry on the question." *Drope v. Missouri*, 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). The relevant question is "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Pate v. Smith*, 637 F.2d 1068, 1072 (6th Cir.1981) (quoting *De Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir.1976)). Once a sufficient doubt arises regarding the defendant's competence, the trial judge must hold a hearing to decide the issue. *See id.*

There does not appear to be any evidence that Berry did not understand the proceedings against him, and defense counsel admitted at trial that Berry understood the function of the judge and jury. Petitioners argue, however, that evidence before the trial court created sufficient doubt as to whether Berry was able to assist counsel in his defense.

 Factors relevant to a defendant's competence include irrational behavior, demeanor at trial, and any prior medical opinions on competence. *See Drope*, 420 U.S. at 180. Berry was diagnosed with psychotic and personality disorders, and had evidence of genetic and organic brain disorders. Ber-

ry had a long history of mental illness and bizarre behavior. This behavior included hallucinations, withdrawal, and an apparent obsession with a girl that was not interested in him, and a preoccupation with "the lady in black." He had been institutionalized in the past, and made multiple suicide attempts. Although Dr. Goldberg had previously expressed his opinion that Berry was competent to stand trial, defense counsel informed the trial court on July 30, 1990, the morning of the mitigation phase of the trial, that the psychologist was concerned that Berry was no longer competent.

Petitioners argue that Berry's inability to assist counsel was demonstrated by his failure to inform counsel of highly relevant information, including his motive for the crime. Petitioners also argue that Berry did not assist in his defense because of his desire to die. Although Berry did not attempt suicide while awaiting trial, he expressed his desire to die when arrested, when interviewed by Dr. Goldberg, and in a prepared statement for the jury. Several federal courts have found sufficient evidence of incompetence where a defendant attempted suicide, the ultimate manifestation of a desire to die. *See, e.g., United States v. Mason*, 52 F.3d 1286, 1292–93 (4th Cir.1995) (defendant attempted suicide after conviction and physicians found defendant incompetent during first phase of trial); *Moran v. Godinez*, 57 F.3d 690, 695 (9th Cir.1994) (defendant on medication, attempted suicide, and wanted to fire attorneys). Berry was arguably not able to assist attorneys because he had no motive to act to save his own life.

Federal courts under circumstances similar to those in the case *sub judice* have found that sufficient doubt existed on the issue of competence. In *Tiller v. Esposito*, 911 F.2d 575, (11th Cir.1990), the Eleventh Circuit found that the trial court erred by failing to hold a competency hearing before the defendant entered a guilty plea. The psychiatrist's report in *Tiller* stated that the petitioner had committed murder and burglary under the direction of auditory hallucinations. *See id.* at 576. Similarly, Berry contends that a voice told him what to do during the killing of Mr. Mitroff. In *Tiller*, the

petitioner had twice attempted suicide while awaiting trial, and at least one attempt was accompanied by command hallucinations. *See id.* at 577. Although there is no evidence that Berry made a suicide attempt while awaiting trial, he made several previous attempts, and the voice inside his head said "What was the use in living?" at the time of at least one of his suicide attempts. Moreover, Berry repeatedly expressed his desire to die from the time he was arrested to just before defense counsel expressed their doubts as to Berry's competence on July 30, 1990.

The Eleventh Circuit in *Tiller* found that the petitioner's family background, suicide attempts, and bizarre account of the murder were ample evidence of past irrational behavior to alert the trial judge to doubt the petitioner's competence. *See Tiller*, 911 F.2d at 577. The court in *Tiller* also noted that the court-appointed psychiatrist believed that the petitioner was unable to assist counsel. *See id.* Although Dr. Goldberg did not make such a finding, Berry's case is sufficiently similar to *Tiller* to provide him with a colorable claim. Moreover, defense counsel represented to the trial court that based on the new evidence, Dr. Goldberg had expressed doubt as to the continued accuracy of his previous finding.

This new information, when combined with the other evidence before the trial court, could be considered to create sufficient doubt to give rise to an obligation to conduct a competency hearing. Assuming the Petitioners have standing to bring this petition on Berry's behalf, a stay of execution is appropriate at this juncture given that Berry has a colorable claim under *Drope*.

### b. The *Gerstein* claim

■ Petitioners' *Gerstein* claim is based upon the fact that the Kentucky State Court did not give Berry a probable cause hearing within 48 hours of his arrest, and the fact that the Kentucky Police contained Berry for 9 days before he appeared in Court. In *Gerstein*, the United States Supreme Court held that the Fourth Amendment mandates a prompt judicial determination of probable cause as a prerequisite to any extended restraint after a warrantless arrest.

420 U.S. at 125. In *Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), the Supreme Court clarified its holding in *Gerstein* by defining "prompt" to mean within 48 hours of arrest. If the probable cause determination does not occur within 48 hours, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance. *Id.* at 57. The *Gerstein/McLaughlin* rule applies retroactively to those convictions not yet final at the time of the McLaughlin decision (in 1991). *Powell v. Nevada* 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994).

■ Petitioners argue that Berry was improperly held beyond the allowed time under *Gerstein* and *McLaughlin* and therefore any evidence, such as his confessions, represents tainted fruit of the poisonous tree. While this Court recognizes that Petitioners' *Gerstein* claim must overcome a procedural bar argument, as well as the argument that the exclusionary rule may not be applied in collateral review, the claim could result in a new trial for Berry, and, therefore, it is a "substantial" enough colorable claim to serve as an alternative basis to justify the stay at this juncture.

### c. Protection of the Great Writ

■ The petition for habeas corpus relief filed by Petitioners on behalf of Berry as his next friend is the first petition for federal habeas corpus relief filed on behalf of Berry. The Petitioners request a stay so that competency can be properly determined, and if appropriate, so that the merits of their claims in the petition may be reviewed and ruled upon by this Court. Denying the requested stay would also, in effect, be a dismissal of their petition because Berry's execution would moot the petition. Thus, this Court's determination of the Petitioners' request for a stay of execution is guided by the clear indication from the Supreme Court of the United States that the

> [d]ismissal of a first federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking

injury to an important interest in human liberty.

*Lonchar v. Thomas*, 517 U.S. 314, 116 S.Ct. 1293, 1299, 134 L.Ed.2d 440 (1996); *see also, Cone v. Bell*, 956 F.Supp. 1401, 1404 (W.D.Tenn.1997) ([In *Lonchar*,] the Supreme Court implicitly found that a petitioner's interest in obtaining review of his first habeas petition and avoiding execution pending resolution of that petition outweighs the state's interests in finality and enforcing its judgment at that particular moment).

In addition, this Court is guided by the similar conclusion in *Rahman v. Bell*, 927 F.Supp. 262, 265 (M.D.Tenn.1996), (citing *McFarland v. Scott*, 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994)), stating: "Congress has recognized that federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty."

Further, Petitioners argue that Berry's unconscious state caused by the 1997 beating is subsequent information relating to Berry's competency that was not considered by the state courts. Petitioners argue that the unconscious state that Berry was beaten into may have damaged his brain, and therefore his mental capacity. While Petitioners' argument is not based upon terribly persuasive evidence that would, by itself, warrant the imposition of a stay and a new evidentiary hearing, this Court must also be mindful of the fluctuating nature of the fact of competency. In some circumstances, an up-to-date determination of competency may be required, or may be used as corroborating evidence, since the fact of competency is not one of historical record but is one that fluctuates.[8] *See, e.g., Brewer v. Lewis*, 989 F.2d 1021, 1027 (9th Cir.1993); *Id.*, at 1030 (J. Norris, dissenting); *Smith v. Armontrout*, 626 F.Supp. 936, 938–40 (W.D.Mo.1986). Finally, even though Petitioners filed this first petition a mere 12 days before the scheduled execution, "the timing of the petition does not affect the granting of a stay." *Bell*, 956 F.Supp. at 1405.

### G. Limitation of this decision

This Court's grant of a stay of execution and motion for evidentiary hearing is a limited ruling. Granting the stay is necessary to protect this Court's jurisdiction over the case, for if Berry is executed while the competency question is pending, the case would become moot even if it later appears that Berry clearly was incompetent, and that he had valid constitutional claims.

This Court finds that Petitioners have established enough meaningful evidence of incompetency to justify an evidentiary hearing to determine whether Berry is in fact competent under *Rees* to abandon any further litigation of his Constitutional claims. This Court also finds that it is not bound under 28 U.S.C. § 2254 by the state court's finding of a competent waiver due to that court's contrary interpretation, incorrect modification, and unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States in *Rees*. The Ohio Supreme Court's ruling precluded the mental health experts from considering the possibility that Berry's schizotypal mental disorder *may* have substantially affected his capacity to waive his right to pursue any further appeals. The *Rees* Court did not intend for the state court so to do.

Finally, because of the obviously irreversible nature of the death penalty—a penalty with a finality that knows no equal—this Court has resolved all doubts as to legal issues in favor of granting a stay. *See, e.g., Evans v. Bennett*, 440 U.S. at 1303–04, 1306. It must be noted however, that this Court has not made a final determination on Berry's competency under *Rees*, and, therefore, has not finally resolved the issue of Petitioners' "next friend" standing. It is quite possible that after a proper competency hearing is held, this Court could find that Berry is competent to waive his right to pursue post-

---

8. Moreover, competency is not the only fluctuating aspect to this matter, for it is also extremely common in cases of "volunteers" like Berry that the inmates' decisions to waive their rights to post-conviction relief fluctuates. *See, e.g., Lonchar v. Thomas*, 517 U.S. 314, 116 S.Ct. 1293, 1295–96, 134 L.Ed.2d 440 (1996); *Smith v. Armontrout*, 812 F.2d 1050, 1052 (8th Cir.1987); *In re Cockrum*, 867 F.Supp. 484, 485 (E.D.Tex. 1994); *Rahman v. Bell*, 927 F.Supp. 262, 263 (M.D.Tenn.1996).

**934**

conviction review of his claims, and that therefore, his family's claim to next friend standing should fail. In that case, Berry's waiver will be respected and he will be executed. It is also possible that, should next friend standing be granted by this Court, and Berry's Constitutional claims be reviewed, Berry's claims for post-conviction relief will be denied, and he will then be executed. Finally, it is also possible that, should next-friend standing be granted by this Court, and Berry's Constitutional claims are deemed valid, Berry could be grated a new trial.

## IV. CONCLUSION

Upon consideration of all of the above, and the record, the Court hereby GRANTS Petitioners' Motion for Stay of Execution and Motion for Evidentiary Hearing to determine the standing of the Next Friends to proceed with appeals on behalf of Wilford Berry.

**IT IS SO ORDERED.**